[742 NYS2d 264]

40 WEST 67TH STREET, Appellant, v DAVID PULLMAN, Respondent.

First Department, May 23, 2002

APPEARANCES OF COUNSEL

*John T. Van Der Tuin* of counsel (*Balber Pickard Battistoni Maldonado & Van Der Tuin, PC,* attorneys), for appellant.

*Steven Altman* of counsel (*Ziegler, Ziegler & Altman LLP,* attorneys), for respondent.

## OPINION OF THE COURT

MAZZARELLI, J.P.

In October 1998, defendant David Pullman bought a co-op apartment at 40 W. 67th Street. Plaintiff corporation owns the building, which contains 38 apartment units. Appurtenant to the proprietary lease for his apartment (7B), defendant holds 80 shares of capital stock in plaintiff corporation. Article III (first) (f) of each tenant's lease provides that the co-op may terminate a tenancy on 30 days' notice if a lessee is found to be undesirable because of "objectionable" conduct. This requires a vote of at least two thirds of the shareholders of the corporation, at a duly called meeting. At issue on appeal is the termination of Mr. Pullman's lease.

Soon after Pullman moved into his apartment, he began to make numerous requests to change the building's facilities or services. According to the affidavit of the building's managing agent, Pullman requested that the lobby mailboxes be replaced, that video camera security be installed in the building, and that 24-hour door attendants be hired. The managing agent also stated that each of Pullman's requests was considered by the board, and deemed inadvisable, for architectural, technical, financial, or other substantive reasons. Pullman also repeatedly complained and threatened to sue the co-op's managing agent and the co-op board's president for failure to abate a claimed noise problem emanating from apartment 8B, directly above Pullman. Apartment 8B had been leased for more than 20 years by a retired college professor and his wife. In the month of October 1999 alone, Pullman sent at least 16 written complaints to the co-op's managing agent about noise from this apartment.

He said that there was banging in the middle of the night from machines that were used in a commercial book binding

business. Pullman also complained of a blasting stereo or television. The co-op board investigated Pullman's complaints, which it found to be unsubstantiated. Upon examination of apartment 8B, the members of the co-op board did not find a television or stereo. They also found no evidence that these tenants were involved in a book binding business or any other commercial enterprise. In an affidavit in a related action, Pullman stated that the prior lessees of his apartment had complained about the noise from apartment 8B. This was shown to be false. The former tenants of apartment 7B submitted an affidavit in one of the related lawsuits denying Pullman's assertions, and stating that in the over 40 years that they occupied the apartment, they never heard unreasonable or excessive noise coming from apartment 8B. Tension between Pullman and the apartment 8B tenants continued to build, and Pullman was apparently assaulted by the husband in an elevator. This resulted in criminal charges against the husband, which were ultimately adjourned in contemplation of dismissal.

In the year 2000, Pullman instituted four lawsuits against his upstairs neighbors and the co-op and its management. The first lawsuit was brought against the apartment 8B tenants. It is still pending and seeks money damages for the nuisance allegedly created by the noise, and for injuries resulting from the husband's assault on defendant. The second lawsuit, also against the upstairs tenants and still pending, seeks injunctive relief in the form of an order to compel them to control the noise from their apartment. The third pending action is against the co-op president. It alleges a breach of fiduciary duty for not acting to stop the upstairs tenants' alleged transgressions. The fourth action, also still continuing, was instituted against the co-op and its managing agent. It alleges a breach of lease and violation of the warranty of habitability for failing to address the noise problem. Pullman attempted to commence two other actions against the various defendants by order to show cause. However, the IAS court refused to sign the orders when presented with them.

Pullman also circulated leaflets to the other co-op shareholders. One of these, entitled "ATTACK CRIME," detailed the assault by the upstairs tenant and urged the shareholders to evict him, stating that he "has the makings of a psychopath in our midst." Another leaflet urged the ouster of the president of the co-op board for a conflict of interest. During this same period, the co-op board sent Pullman a letter stating that he

was not in compliance with the terms of his lease. The letter informed Pullman that he had already violated a number of the terms of the proprietary lease by renovating his kitchen, installing soundproofing inside his windows, and employing a construction worker on a Saturday. The letter requested that Pullman either install carpeting in his bedrooms, or submit a waiver of the carpeting requirement to the board signed by his downstairs neighbors. Pullman ignored the board's requests that he "furnish a list of all renovations and redecorating to [his] apartment" from the date of his purchase of shares, and he refused to allow an inspection of his apartment.

On June 27, 2000, the shareholders held a special meeting pursuant to article I, section 1 of the corporation's bylaws. The purpose of the meeting was to determine whether Pullman's tenancy in the building was "objectionable." Pullman was notified of the meeting, but did not attend. After discussion of the issues, a supermajority, the holders of 75% of the outstanding shares in the co-op, voted in favor of a resolution detailing how Pullman's continued tenancy was objectionable, and directing the Board to terminate Pullman's proprietary lease. The vote was 2,048 shares in favor of termination, 0 opposed, and 542 shares not present and not voting. The Board delivered the notice of termination to Pullman, dated July 7, 2000, and effective August 31, 2000. Pullman ignored the notice and continued to reside in the apartment after its effective date.

In October 2000, plaintiff brought this action. The amended complaint contains five causes of action. The first and second seek ejectment and possession of the apartment. The second cause of action specifically alleges that Pullman's tenancy is "objectionable." The third cause of action is for a declaratory judgment canceling Pullman's stock. The fourth cause of action prays for a money judgment for use and occupancy from September 1, 2000. The fifth cause of action seeks reasonable attorneys' fees and costs of the litigation.

Pullman moved to dismiss the complaint for failure to state a claim (CPLR 3211 [a] [1], [7]). In opposition, plaintiff sought summary judgment pursuant to CPLR 3211 (c). The court dismissed plaintiff's first claim, denied dismissal of the remainder of the complaint, and denied plaintiff's motion for summary judgment. The court reasoned that under RPAPL 711 (1), it was the province of the court, not the co-op board, to determine whether a tenancy should be terminated based upon "objectionable" conduct. It found numerous disputed factual issues surrounding the termination of Pullman's tenancy which

would require a trial. The motion court also determined that among the issues to be tried was the question of whether the eviction was retaliatory, as proscribed by Real Property Law § 223-b.

We reject Pullman's argument, adopted by the dissent, that RPAPL 711(1) requires judicial scrutiny of the basis for this tenant's ejectment. This case is governed by the holding of the Court of Appeals in *Matter of Levandusky v One Fifth Ave. Apt. Corp.* (75 NY2d 530, 537-538), which applied the "business judgment rule" to explicitly "prohibit[ ] judicial inquiry into actions of corporate directors 'taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.' (*Auerbach v Bennett*, 47 NY2d 619, 629, *supra*.)" *Levandusky* generally prohibits judicial scrutiny of the actions of the board of directors, and its holding insulates the determination of this co-op board from judicial review. The board's action here was premised upon the unanimous vote of a supermajority of the shareholders at a duly called meeting. It terminated the defendant's lease for breach of a provision requiring that shareholders not engage in "objectionable conduct," inimical to the welfare of the cooperative community.

The dissent argues that the *Levandusky* rule should not apply in this case because the defendant-tenant faces the loss of his home. However, the defendant, as did all the other shareholders, agreed to just such a sanction when he purchased shares in a cooperative. By doing so, Pullman voluntarily "agree[d] to submit to the decisionmaking authority of [the] cooperative board" (*Levandusky, supra* at 536). Prior to his purchase, Pullman was aware of the restrictions on his behavior and limitations on the ownership of his shares, and, nonetheless chose to buy his apartment. Pursuant to the Court of Appeals holding in *Levandusky*, "would-be apartment owners must generally acquiesce [to] a governing board['s] * * * significant[ ] restrict[ion] [of] the bundle of rights a property owner normally enjoys" (*id.*). Any other result would undermine the purpose of this unique form of shareholder-lease, in which the paramount interest of the board of directors is the welfare of the "entire community of residents in an environment managed by the board for the common benefit" (*id.* at 537).

In *Levandusky*, a cooperative tenant sought to renovate his kitchen. The proposed renovation necessitated the realignment of a steam riser in the kitchen, and the lease specifically provided that this type of alteration required the co-op board's

prior written consent. The board's consulting engineer advised that any change in the building's old piping system risked causing difficulties, or awakening "gremlins." The board thus conditioned its approval of the renovation upon submission of a revised plan which would not involve moving the steam riser. Notwithstanding the board's determination, the tenant hired a contractor who moved the steam riser. The board issued a "stop work order," and the tenant brought a CPLR article 78 proceeding to have the stop work order set aside. The Court of Appeals concluded that "the business judgment rule applies to the decisions of cooperative governing associations enforcing building policy, and that the action taken by the board in [that] case [fell] within the purview of [that] rule" (*id.* at 535). Significantly, the Court (at 536) described the co-op association as,

> "a quasi-government—a little democratic sub society of necessity * * * The proprietary lessees or condominium owners consent to be governed, in certain respects, by the decisions of a board. Like a municipal government, such governing boards are responsible for running the day-to-day affairs of the cooperative and to that end, often have broad powers in areas that range from financial decision-making to promulgating regulations regarding pets and parking spaces * * *. Through the exercise of this authority, to which would-be apartment owners must generally acquiesce, a governing board may significantly restrict the bundle of rights a property owner normally enjoys." (Internal quotation marks and citations omitted.)

The Court of Appeals said that the need for a "check [against abuse of a board's] potential powers to regulate residents' conduct, life-style and property rights" must be balanced with the desire to promote the primary objective of the cooperative structure, which is "protection of the interest of the entire community of residents in an environment managed by the board for the common benefit." (*Id.* at 537.) To best achieve this balance, the Court determined that the deferential business judgment rule was the appropriate standard for judicial review (*id.*; *Sirianni v Rafaloff*, 284 AD2d 447; *Jones v Surrey Coop. Apts.*, 263 AD2d 33, 36). The majority specifically adopted the business judgment rule as preferable to a "reasonableness" rule, which would have allowed the court to independently evaluate the merits of a board's decision (*Levandusky, supra* at 535).

Under the business judgment rule, it is presumed that the actions of a cooperative's directors are "taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes" (*Auerbach v Bennett*, 47 NY2d 619, 629). Absent a showing of a breach of fiduciary duty, "the exercise of [the co-op board's powers] for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient" (*Pollitz v Wabash R.R. Co.*, 207 NY 113, 124).

While the action reviewed in *Levandusky* was the denial of a tenant's application for a variance to move a steam riser in a tenant's kitchen, its holding has been repeatedly applied to boards' determinations of what are appropriate policies and procedures (*see, e.g., Jacobs v 200 E. 36th Owners Corp.*, 281 AD2d 281 [1st Dept] [rule regulating procedure for handling food deliveries]). The majority decision in *Levandusky* explicitly stated that the business judgment rule should be applied to all co-op board determinations. The Court found universal application of this standard of review appropriate because "unnecessary confusion [would be] generated by prescribing different standards for different categories of issues that come before cooperative boards" (*id.* at 541). The deference granted to the board under this rule is consistent with the settled notion of a co-op as a voluntary association of individuals who agree to compromise their rights to obtain the benefits of living in a cooperative type of community. This includes choosing "with whom they wish to share their elevators, their common halls and facilities, their stockholders' meetings, their management problems and responsibilities and their homes" (*Weisner v 791 Park Ave. Corp.*, 6 NY2d 426, 434).

Two recent cases from this Court have applied the business judgment rule to insulate co-op boards' valuations of tenants' shares in cooperative corporations. In *Jones v Surrey Coop. Apts.* (263 AD2d 33), upon termination of a tenancy, the co-op board exercised an option in its bylaws to repurchase the tenant's shares at book value. The tenant sued to recover market value of the stock, which was considerably higher. We granted the board's motion for summary judgment. We found that the plaintiff failed to meet the burden of showing that the board of directors breached its fiduciary duty by engaging in discrimination, self-dealing, or other misconduct. We held that under *Levandusky*, the absence of these factors prohibited judicial inquiry into the actions of the co-op's directors (*id.* at 36). More recently, in *Schultz v 400 Coop. Corp.* (292 AD2d

16), the plaintiffs sought redress for the alleged overallocation of shares to their apartment, asserting unequal treatment between the plaintiffs and another apartment owner on the same floor. We found that "[a]lthough 'unequal treatment of shareholders is sufficient to overcome the directors' insulation from liability under the business judgment rule * * *' * * * the disparate treatment alleged to comprise a breach of fiduciary duty [did not] result in [any] injury to [plaintiffs,] the complaining tenant" (*id.* at 22 [citations omitted]). We concluded that "[p]laintiffs have not been subjected to discriminatory treatment, and they have set forth no other basis warranting departure from the application of the business judgment rule to subject the actions taken by the cooperative board of directors to judicial scrutiny" (*id.* at 23).

Also of note is the Second Department's recent application of *Levandusky* in *Sirianni v Rafaloff* (284 AD2d 447). In that case, the Second Department upheld a co-op board's decision to terminate a tenancy for breach of a lease provision prohibiting the use of a residential unit for commercial purposes (*see, Sirianni, supra* at 448). There, as in *Jones* and *Schultz*, the Court found no basis to intrude upon the board's decision to enforce a lease provision.

The lease provision at issue in this case requires that the termination of a tenancy because of undesirability be based not only upon a board's resolution, but upon the vote of two thirds of the shareholders. Thus, the decision here was not made by a small group of people, but reflects the consensus of 75% of the shareholders. In fact, every shareholder who attended the meeting agreed that Pullman "has engaged in repeated actions inimical to cooperative living and objectionable to the corporation and its shareholders."

The affidavit of the managing agent of the co-op, submitted in opposition to Pullman's motion for summary judgment, emphasized that the termination of his tenancy will not cause Mr. Pullman to forfeit the economic value of his apartment. He states that upon sale of the apartment, the co-op will "turn over [to Pullman] all proceeds after deduction of unpaid use and occupancy, costs of sale and litigation expenses incurred in this dispute."

Contrary to the dissent's analysis, RPAPL 711 (1) does not preclude our deference to the co-op board's determination to terminate Pullman's tenancy in this plenary ejectment action. While RPAPL 711 (1) provides that a landlord may terminate a tenancy in a summary holdover proceeding, upon a showing

*"to the satisfaction of the court* that the tenant is objectionable" (emphasis supplied), *Levandusky* explicitly precludes judicial inquiry into the lawful actions taken by a co-op board of directors. As applied here, the *Levandusky* holding is in complete harmony with RPAPL 711 (1), the vote of the supermajority of the shareholders of the co-op providing, in the realm of co-op governance, the functional equivalent of "competent evidence [which would] establish to the satisfaction of the court that the tenant is objectionable" (*see*, RPAPL 711 [1]).

Moreover, the Court of Appeals explicitly addressed the limitations on deference to co-op board action, and the role of the court in such situations when it wrote that the business judgment rule, "permits review of improper decisions, as when the challenger demonstrates that the board's action has no legitimate relationship to the welfare of the cooperative, deliberately singles out individuals for harmful treatment, is taken without notice or consideration of the relevant facts, *or is beyond the scope of the board's authority*" (*Levandusky* at 540 [emphasis supplied]).

Further, our holding also does not eviscerate the important policy underlying RPAPL 711 (1), which is to prevent arbitrary self-help evictions. This is certainly an important consideration which applies equally to co-op tenants. However, following *Levandusky* does not mean that tenants are without protection if a board acts in an illegal, discriminatory, or bad faith manner. Under the facts presented, no improper motive has been established on the part of the co-op board. Pullman has not provided any factual support for his allegations that he was evicted based upon illegal or impermissible considerations (*see*, *Walentas v Johnes*, 257 AD2d 352, *lv dismissed* 93 NY2d 958). In the absence of such evidence, we must presume that the consensus of 75% of the shareholders that the defendant's conduct was "objectionable" was sincere. Moreover, the presumption of regularity applies, and defendant has failed to rebut it. He has not provided any basis to show that the determination to terminate his tenancy was without a "legitimate relationship to the welfare of the cooperative" (*Levandusky*, *supra* at 540). Thus, we defer to the unanimous vote of assembled shareholders to terminate defendant's tenancy, without passing on the merits of that decision. We also note that while *Adams Hotel Owners v Wolf* (64 Misc 2d 614) and *Brisbane House v Sims* (122 Misc 2d 46) both applied RPAPL 711 (1) to preclude the termination of tenancies pursuant to a provision in a cooperative leasehold, these cases were decided prior to *Levandusky*.

However, were we to look behind plaintiff's actions, we would find that the record amply supports the determination that Pullman's tenancy is "objectionable." He attempted to institute six lawsuits based upon an unsubstantiated noise complaint; he bombarded the managing agent with demands and complaints, in rapid sequence and accompanied by threats; he distributed leaflets containing offensive personal allegations against another leaseholder; and he violated building rules by failing to install carpeting and making unauthorized alterations. These actions have had a negative effect on all of the 37 other leaseholders including making them responsible for the payment of thousands of dollars in unnecessary legal fees.

Accordingly, the order of the Supreme Court, New York County (Marilyn Shafer, J.), entered July 12, 2001, which, inter alia, granted defendant's motion to dismiss the first cause of action of the amended complaint and denied plaintiff's cross motion for summary judgment pursuant to CPLR 3211 (c) on its first and third causes of action, should be modified, on the law, to grant plaintiff summary judgment on its first, third, fourth and fifth causes of action, to remand for a hearing on use and occupancy, legal fees and costs, to dismiss plaintiff's second cause of action, and otherwise affirmed, without costs.

SAXE, J. (dissenting.) To the cooperative shareholders of 40 West 67th Street in New York City, defendant David Pullman, the proprietary lessee of apartment 7B, is a difficult tenant, so difficult that the shareholders of his co-op by resolution voted to terminate his lease and seek his ouster from possession. The propriety of this termination is the subject of this appeal.

The story of the relationship between Mr. Pullman and the plaintiff cooperative corporation is one of accusations, recriminations and, not surprisingly, litigation. Problems began soon after Mr. Pullman moved into his apartment, when he began to complain of unreasonable noise coming from apartment 8B, immediately above his, in the form of excessively loud footsteps, stereo and television sound. His subsequent complaints included a claim of an illegal book binding business being run out of 8B, and another that toxic and flammable chemicals were being stored there. He complained first to the managing agent, but was dissatisfied with the responses he received— that 8B had been inspected and there was no evidence of any illegal business being conducted there, nor was there a lack of bedroom carpeting as he had claimed. Pullman thereafter ad-

dressed his complaints of unreasonable noise to the cooperative board's president, but was not satisfied with the response. Failing to resolve his complaints, Pullman commenced four lawsuits against the cooperative corporation, its managing agent, its president, and his upstairs neighbors. He also circulated flyers to building residents complaining of his treatment and of other perceived misconduct. In addition, he claimed that in an altercation with his upstairs neighbor, he was physically assaulted, resulting in his neighbor's arrest.

The proprietary lease between the cooperative corporation and Pullman contains a provision allowing for termination of the lease upon the occurrence of specified events:

> "If, upon, or at any time after the happening of any of the events mentioned in subdivisions (a) to (g) * * * the Lessor shall give to the Lessee a notice stating that the term hereof will expire on a date at least thirty days thereafter, * * * this lease shall expire on the date fixed in the notice, it being the intention of the parties hereto to create hereby a conditional limitation, and it shall thereupon be lawful for the Lessor to reenter the apartment and to remove all persons and personal property therefrom, either by summary dispossess proceedings, or by any suitable action or proceeding at law or in equity, or by force or otherwise, and to repossess the apartment in its former estate as if this lease had not been made; * * *

> "(f) if at any time the Lessor shall determine, upon the affirmative vote of * * * at least two-thirds of * * * [the proprietary lessees] at a meeting of such stockholders duly called to take action on the subject, that because of objectionable conduct on the part of the Lessee, * * * the tenancy of the Lessee is undesirable * * *."

Pursuant to this provision, plaintiff cooperative called a special meeting of shareholders and held a vote at which over two thirds of the other proprietary lessees concluded that Pullman had engaged in objectionable conduct and therefore his tenancy was undesirable. A notice was then sent to Pullman terminating his lease as of August 31, 2000 and asking him to surrender his apartment by that date. Thereafter, following his failure to do so, the co-op corporation brought this ejectment action in the Supreme Court on the ground that Mr. Pullman's

proprietary lease had been terminated due to his pattern of objectionable conduct.

Defendant sought dismissal pursuant to CPLR 3211 for failure of the co-op to comply with the directives of RPAPL 711 (1), and plaintiff cooperative corporation cross-moved for summary judgment under CPLR 3211 (c) on its ejectment claim, relying on the standard of review established for the decisions and conduct of a co-op's board of directors in *Matter of Levandusky v One Fifth Ave. Apt. Corp.* (75 NY2d 530).

The IAS court granted defendant's motion to dismiss only as to the cause of action based upon the business judgment rule, and denied summary judgment to plaintiff on its remaining causes of action.

I would affirm the order on appeal, dismissing the cause of action that relies upon application of the business judgment rule, and leaving the remainder of plaintiff's causes of action to be decided at trial. In my view, the motion court properly held that the *Levandusky* rule is inapplicable in these circumstances, and that the co-op corporation has the obligation to demonstrate its entitlement to possession of the apartment by proving to the satisfaction of the court that the lessee had engaged in objectionable conduct. Moreover, based upon an examination of this record, I would hold that material issues of fact exist, precluding the grant of summary judgment.

Application of *Matter of Levandusky v One Fifth Ave. Apt. Corp.*

I respectfully disagree with the position taken by the majority, namely, that application of the rule enunciated in *Matter of Levandusky v One Fifth Ave. Apt. Corp.* (75 NY2d 530) precludes the court from considering the evidence and determining independently whether the plaintiff co-op corporation has established the right to eject the proprietary lessee from his home on grounds of objectionable conduct. I suggest that the proprietary lessee, like any other tenant, is entitled to judicial scrutiny of the basis of the ejectment sought against this allegedly undesirable tenant (*see*, RPAPL 711 [1]).

In *Levandusky* (*supra*), a residential cooperative corporation sought to enforce its determination prohibiting a proprietary lessee from realigning the steam riser in his kitchen as part of his renovation plans. The Court explained that such a board must be given broad leeway in order to enable it to manage the day-to-day affairs of the cooperative, to make business and financial decisions, to make and enforce building policy, and to promulgate house rules and regulations, for the benefit of its

residents as a whole (*id.* at 536-537). Focusing on the most appropriate standard of court review for challenges by tenant-shareholders to the actions of cooperative boards, the Court held that:

> "So long as the board acts for the purposes of the cooperative, within the scope of its authority and in good faith, courts will not substitute their judgment for the board's. Stated somewhat differently, unless a resident challenging the board's action is able to demonstrate a breach of this duty, judicial review is not available" (*id.* at 538).

Therefore, when tenant-shareholders challenge the business and financial decisions of a cooperative board, under *Levandusky*, the board will not be required to prove in court the reasonableness of its actions unless the tenant shows that (1) the board was acting other than to further the interests of the corporation, (2) the action taken by the board was outside the scope of its authority, or (3) the board was acting in bad faith (*id.*).

The types of disputes to which *Levandusky* has generally been applied have usually involved shareholder challenges to board decisions regarding management of the building and the enactment and enforcement of house rules (*see, e.g., Katz v 215 W. 91st St. Corp.*, 215 AD2d 265 [restrictions of placement of planters on roof]; *Nuzzo v Board of Mgrs. of Jefferson Vil. Condominium No. 1*, 228 AD2d 568 [motorcycle ban within condominium development]; *Longo v Town 'N Harbor Owners Corp.*, 180 AD2d 779, *lv dismissed* 80 NY2d 924 [dumpster placed near proprietary lessee's apartment]; *Rubinstein v 242 Apt. Corp.*, 189 AD2d 685 [common usage of roof garden expanded]). It has also been applied regularly with regard to decisions rejecting prospective apartment purchasers (*see, e.g., Cooper v Greenbriar Owners Corp.*, 239 AD2d 311; *Simpson v Berkley Owner's Corp.*, 213 AD2d 207).

The foregoing types of day-to-day business or financial decisions are qualitatively different from a decision to evict a tenant-shareholder from his home. While it is eminently reasonable to impose *Levandusky*'s severely limited form of judicial review upon co-op shareholders' challenges to business decisions by their elected boards of directors, this limited type of review is simply too narrow a prism to protect tenants against the loss of their homes. While the ordinary management decisions of a co-op board may result in some sort of negative impact upon an individual tenancy, they cannot compare

to the loss of a person's home. Nor may we equate a board's decision to reject a proposed purchaser with an eviction of a present tenant; a proposed purchaser has no present possessory interest in the property, and is merely being prevented from obtaining it.

However, it is not merely on policy grounds that we should require a co-op board to offer evidence in court proving the allegations that formed the predicate for the proceeding before permitting it to evict an allegedly undesirable tenant-shareholder. It is also because the *Levandusky* rule, which provides co-op boards with the broadest possible leeway to manage their property without undue interference, must yield to a statute which specifically controls the actions of a co-op board in a particular circumstance. Notably, despite the apparent breadth of the *Levandusky* rule, it has never been used to permit a co-op board to avoid the application of an otherwise applicable statute. Its intended application is in regard to the types of actions by cooperative boards that are not controlled by statute.

It would violate both law and logic to allow a co-op board to use *Levandusky* as a shield to avoid a shareholder's challenge if that challenge was based upon an alleged violation of law. For example, if a co-op board should decide to undertake some form of construction on its property in violation of applicable building codes or zoning laws, it is readily apparent that a tenant-shareholder would not be prevented by the *Levandusky* rule from challenging such planned construction on the ground that it was illegal. Indeed, some might argue that such actions should be considered to be outside the scope of the board's authority, because a board cannot have the authority to act illegally.

If we were merely presented with a claim that the cooperative corporation failed to follow the agreed-upon procedures for termination, namely, the board's calling a meeting, presenting its position to the tenants, and conducting a shareholder vote, *Levandusky* would indeed apply to any challenge that the board had conducted itself improperly, absent a showing of bad faith or discrimination (*see, Sirianni v Rafaloff*, 284 AD2d 447, 448; *Cannon Point N. v Abeles*, 160 Misc 2d 30, 31). However, this is an action to recover possession of Pullman's apartment.

"The relationship between a shareholder-tenant and the cooperative is that of landlord and tenant" (1 Dolan, Rasch's Landlord and Tenant—Summary Proceedings § 4:26, at 197 [4th ed]). Once the corporation, in the position of landlord,

proceeds to seek a court order ejecting the proprietary lessee from his home, the rights and obligations of the parties are dictated by statute, and the lessee, like any other tenant, is entitled to the statutory protections designed to ensure that an assertedly objectionable tenant is not ejected from his home without a court's review of the evidence. The protections provided by law to tenants facing eviction must apply with equal force whether the tenant is a renter or a proprietary lessee of a cooperative apartment.

Applicability of RPAPL 711 (1)

The articles of the RPAPL that provide for recovering possession of real property (*see generally*, RPAPL arts 6, 7) reflect the recognition that our law must protect tenants' rights as well as the rights of property owners. These statutes provide for the simplest possible means by which landlords may regain possession of property wrongfully held by a tenant (*see, New York Univ. v Farkas*, 121 Misc 2d 643), while at the same time protecting tenants who are peaceably in possession of real property from unilateral entry by the landlord to retake possession (*see*, DeGraffe, *The Development of Unlawful Evictions and Tenant Remedies for Injurious Conduct in New York*, 41 Syracuse L Rev 1179, 1181).

Depending upon the provisions of the parties' lease, a lessor seeking to recover possession of property may be entitled to proceed by summary holdover proceeding, such as where a tenant remains in possession of premises following the expiration or automatic termination of his lease term resulting from an occurrence set forth in a conditional limitation; or, if circumstances do not warrant treating the tenant as holding over past the expiration or automatic termination of the lease, the lessor must commence an ejectment action in the Supreme Court (*see, Perrotta v Western Regional Off-Track Betting Corp.*, 98 AD2d 1, 2, 5; *see generally*, 2 Dolan, Rasch's Landlord and Tenant—Summary Proceedings § 23:28 [4th ed]). In this instance, whether for a perceived strategic advantage or otherwise, plaintiff proceeded by an ejectment action rather than by summary holdover proceeding. In any event, however, plaintiff's legal position is the same either way: the lease term was terminated simply by the shareholders' vote deeming Pullman an undesirable tenant and the subsequent 30-day notice sent to him pursuant to that vote.

Notwithstanding the form and setting of the present action, the dictates of RPAPL 711 (1) are directly applicable to these circumstances. The language of the statute provides in relevant part that:

"[a] proceeding seeking to recover possession of real property *by reason of the termination of the term fixed in the lease pursuant to a provision contained therein giving the landlord the right to terminate the time fixed for occupancy under such agreement if he deem the tenant objectionable,* shall not be maintainable unless the landlord shall *by competent evidence* establish *to the satisfaction of the court* that the tenant is objectionable" (emphasis added).

Although the statute specifically applies to summary holdover proceedings, I agree with the motion court that it must apply to an ejectment action as well. If the cooperative corporation would be required to comply with the dictates of RPAPL 711 (1) in the context of a summary holdover proceeding, it should not be permitted to avoid those requirements by proceeding in the nonsummary, less streamlined context of a common-law ejectment action.

The cooperative corporation stands in the exact position contemplated by the statute: that of a landlord "seeking to recover possession of real property," having terminated the lease after deeming the tenant "objectionable." From the language of section 711 (1), and in accordance with its underlying policy of having a court ensure that a claim of objectionable conduct is established by competent evidence, the statute's protections must be applied in an ejectment action as well as in a summary holdover proceeding. The form of the lawsuit should not determine whether a proprietary lessee may be evicted based solely upon a resolution of shareholders. Indeed, plaintiff has not disputed that aspect of the motion court's holding.

If RPAPL 711 (1) must apply regardless of the form of the action against an objectionable tenant, the only possible grounds for declining to apply it to the present action would be either that the *Levandusky* rule somehow "overruled" the statute, or that by signing the proprietary lease the lessee waived the statute's protections. Yet, neither of these approaches provides a viable basis for disregarding the statute.

There can be no waiver of a statutory protection without a clear, unequivocal, and deliberate acknowledgment that this particular protection is known and that its relinquishment is intentional (*see, City of New York v State of New York*, 40 NY2d 659, 669; *Matter of Civil Serv. Empls. Assn. v Newman*, 88 AD2d 685, 685-686, *affd* 61 NY2d 1001; *Matter of Columbus Park Corp. v Department of Hous. Preservation & Dev. of City of N.Y.*, 170 AD2d 145, 149, *revd on other grounds* 80 NY2d

19). And, a ruling by the Court of Appeals regarding a standard of review of corporate decision-making simply may not be relied upon to eliminate the applicability of a statute that would otherwise apply.

The majority glosses over the glaring applicability of RPAPL 711 (1) by stating that the vote of the supermajority is "the functional equivalent of 'competent evidence [which would] establish to the satisfaction of the court that the tenant is objectionable' (*see*, RPAPL 711 [1])." Under this view, once the supermajority of shareholders has spoken, there is nothing left for the court to do but rubber-stamp that decision. But, of course, that is not what RPAPL 711 (1) says or requires.

Applying RPAPL 711 (1) to this ejectment action requires that the plaintiff present competent evidence, as opposed to its mere conclusion, establishing *to the satisfaction of the court* that the tenant is objectionable (*see, Brisbane House v Sims*, 122 Misc 2d 46; *Adams Hotel Owners v Wolf*, 64 Misc 2d 614). The question is not whether the conclusion was arrived at by the proper employment of the requisite procedures; that the board handled the process properly is unassailable at this time. However, the conclusion the cooperative corporation arrived at by shareholder vote as to Pullman's undesirability as a tenant is merely the equivalent of a unilateral assessment by an individual landlord that a particular tenant is objectionable. The question for the court to answer is whether the cooperative corporation, as lessor, having come to that conclusion, is now able to establish that fact before the court by competent evidence, just as would any lessor seeking to oust a tenant it found to be objectionable.

For all the foregoing reasons, in my view *Levandusky* cannot be relied upon to definitively establish the cooperative corporation's entitlement to recover possession of Pullman's apartment without the in-court evidentiary review contemplated by statute.

This does not mean the co-op is prevented from ridding itself of objectionable tenants or objectionable activity. It merely requires the cooperative to follow the steps set out in the law to accomplish its purpose.

Summary Judgment

In concluding that summary judgment should be denied in this instance, I do not suggest that the showing made by plaintiff corporation is insufficient as a prima facie showing entitling it to judgment. In contrast to such cases as *Douglas*

*L. Elliman & Co. v Karlsen* (59 Misc 2d 243), the cooperative has made a sufficient showing that Pullman had engaged in objectionable conduct. However, Pullman's submissions create issues of fact as to whether his increasingly disputatious conduct was the result of, and made necessary by, the cooperative's complete failure to take reasonable action to respond to his legitimate complaints regarding unreasonable noise in the apartment above his.

With his own affidavit as well as that of an expert in the area of acoustics, Pullman has shown that the noises emanating from apartment 8B, directly above Pullman's, comprised of banging and rolling sounds and excessively loud footsteps, were measured at the rate of 58 to 66 decibels, which he states is well in excess of the 45-decibel maximum set by city regulation for low-frequency sounds such as those heard. The expert expressed the view that these noises, as measured, are per se unreasonable under Administrative Code of the City of New York § 24-218. He also explained that a sound level of 66 decibels is subjectively experienced as approximately four times as loud as the maximum decibel level set forth in the Code specification. Finally, he explained several reasons why the mitigating measure offered by the Board, namely blowing foam insulation into the ceiling above Pullman's apartment, would merely transform the booming sounds into thudding sounds, and would cause other disadvantages to Pullman as well.

While a reading of the escalating dispute between Pullman and the board seems to raise serious questions as to the propriety of his conduct at the cooperative, it appears, upon more careful scrutiny, that there was a factual predicate to his noise complaints. Accordingly, it is my belief that the view espoused by my colleagues here, that Pullman's responsive conduct was so unreasonable as to warrant, as a matter of law, summary judgment on the objectionability of his conduct, resulting in the termination of his tenancy, is not only unfair but wrong. Put another way, whether his conduct was a reasonable response to his experience with excessive noise and the cooperative's failure to come up with a workable solution presents a question of fact necessitating a trial, as the motion court concluded.

For the foregoing reasons, I would affirm the dismissal of the first cause of action and the denial of summary judgment.

SULLIVAN and FRIEDMAN, JJ., concur with MAZZARELLI, J.P.; SAXE and WALLACH, JJ., dissent in a separate opinion by SAXE, J.

Order, Supreme Court, New York County, entered July 12, 2001, modified, on the law, to grant plaintiff summary judgment on its first, third, fourth and fifth causes of action, to remand for a hearing on use and occupancy, legal fees and costs, to dismiss plaintiff's second cause of action, and otherwise affirmed, without costs.